THOMPSON, Circuit Judge, dissenting.

Hugh M. Morris, of Wilmington, Del. (Drury W. Cooper, Herbert H. Dyke, and Delos Holden, all of New York City, of counsel), for appellant.

Henry M. Huxley, of Chicago, Ill., Caleb S. Layton, of Wilmington, Del., and Edward A. Hampson, of Chicago, Ill., for appellees.

Before WOOLLEY, DAVIS, and THOMPSON, Circuit Judges.

WOOLLEY, Circuit Judge.

Masonite Corporation, the owner of letters patent No. 1,663,505, issued March 20,

**MASONITE CORPORATION v. CELOTEX CO. et al.**

No. 5069.

Circuit Court of Appeals, Third Circuit.

July 6, 1933.

Rehearing Denied Aug. 18, 1933.

1928 to William H. Mason for hard, grainless fiber products and process for making them, brought this action against the Celotex Company for infringement of product claims 5, 6 and 26 and process claims 14, 16, 20, 22 and 23. The trial court, after limiting the claims, found them not infringed and accordingly dismissed the bill. 1 F. Supp. 494. The plaintiff appealed.

As stated in the specification, the object of the invention is to produce from "ligno-cellulose materials, such as wood, and the like," coherent, grainless, hard, dense, stiff and strong products having practically all the characteristics of natural wood but of increased density, and re-made so as to be without grain and free from the weakness which natural wood has across the grain. The product here in question is known to the trade and in this litigation as "hard board," the sole substance of which is wood fiber.

Wood fiber, a threadlike structure, cylindrical and hollow, consists of cellulose which is soft and flexible and is highly hydroscopic. The cellulose is encased in or encrusted by a sheath or capsule which, differing from cellulose, is hard, stiff and resistant to water. This non-cellulose part of the fiber consists of materials known to chemists as lignins, pentosans, and by other names which have in this litigation been grouped under the general classification of lignins. Many arts deal with wood fiber, this little product of nature, when separated from wood growths by processes of disintegration or tearing it away as by abrading, beating, grinding, shredding, and, as the plaintiff prefers, by explosion from under high steam pressure.

The principal wood fiber art perhaps is that of paper making in which the cellulose content of the fiber is the chief element sought and used, whereas the lignin element, objectionable yet tolerated in limited quantities in paper of certain grades, is in paper of other grades entirely or practically entirely digested and destroyed in the chemical processes of obtaining the cellulose.

Another art is that of composition boards —hard boards. Prior to Mason, the Agasote Company of Trenton made a hard board of paper pulp having a wood fiber content chemically treated and containing asphalt and other materials to bind and hold the fibers of the pulp together. The "Beaver Board" and "Cornell Board" were laminated wall boards made of sheets of paper (chemically treated fiber) secured together with silicate of soda. Here again were products indirectly of chemical re-action with a reduction of lignins and a consequent low resistance to water.

In this state of the arts which, as it turned out, were closest to him, Mason conceived the idea of using waste wood products, usually found about saw mills, as a cheap source of a new composition board. Without reciting his mental processes or recounting the accident by which he reduced his ideas to practice, Mason, though recognizing wood as a marvelous product of nature, set about to make what, in a word, is synthetic wood, that is, wood taken apart and put together again, not, of course, as nature would do it but artificially, whereby practically all the advantageous characteristics of wood are retained, some of its disadvantageous characteristics eliminated and new characteristics of its own added. To retain in a board everything that is good in wood, Mason thought he should put back all he took out. This included lignins. What he proposed was to depart abruptly from the arts and avoid chemically digested fiber and chemical action anywhere and resort to the wholly novel practice of tearing wood into shreds, that is, separating out its fibers, and putting them back again physically, without adding any element to weld or bind them together. This conception of Mason was not invention. It was a mere dream until he found a way of bringing it about. Mason found the way; by sheer accident, it is true, yet he found it. It consists in disintegrating wood or woody material into fibrous material, comprising practically all the substance of the original wood or woody material, soaking it with water, forming it into thick felted sheets and subjecting the sheets simultaneously to pressure and heat in given ranges and in a prescribed manner. Though resembling in certain steps the process of paper making, the process of the patent is distinguished from that of the paper art by features which distinguish the two products; paper and hard board of the patent. The result of the process is the product of the patent, a hard wood board with the major woody characteristics retained, certain undesirable ones left out and new characteristics added. Like wood (and unlike paper board) it is nearly as stiff and strong when wet as when dry, and unlike wood it has no grain and therefore no likelihood of splitting. Though of increased density it can be cut and sawed like wood.

The theory of this imitation of nature is that by avoiding chemical action all the natural ingredients of wood, particularly lignins, after separation, are saved and put back, and, when back, the lignins perform the same

function in the board that they performed in the plant, namely: to bind the fibers together. Thus lignins, hard and stiff and tightly compressed, are looked upon as binders. This the defendant contests. In consequence there is much learning and discussion on the subject which we are not disposed to repeat because whatever it is that holds together the fibers in the hard board, they are, as a matter of fact and without regard to theory, bound and held together by some wood element restored. The defendant says it may be cellulose, as cellulose, though soft and flexible, can on compression be made into a board, but cellulose is not resistant to water and dissolves easily. Lignins are water resistant and so is the board of the patent. Put a paper board into water and it reverts to pulp. Hence something other than cellulose must do it. Nothing foreign to wood does it, for "binders * * * from extraneous sources"—pitch, gum, resin, asphalt of the prior art—while permitted, are excluded from the claims. Whatever it may be, the fact is the wood fibers, put back as the patent teaches, do in some way grasp their fellows and hold them fast. That they could be made to do this was a challenge to nature. And it was new. That it worked is shown by the acceptance of the plaintiff's "Presdwood" boards by the trades from about 5,000,000 square feet in 1927 to about 50,000,000 square feet in 1931. It is used in automobile body structures, in motion picture studios, for signs, concrete forms, blackboards, furniture, boats, boat housings, ship panels, wall tiles for bath rooms, kitchens and other wet places, and, indeed, for a variety of purposes. The value of Mason's contribution to industry has been recognized by a grant of medals by the Franklin Institute and the Association of Pulp and Paper Industry. No one, save the defendant, questions that what Mason did was invention. The vice-president and the director of research of the defendant imitated it in their British patent No. 335,052 for a hard board made under heat and pressure from "fibrous materials such as wood fiber, vegetative fibers, etc. * * * from substantially any fiber, produced by plant growth, * * * but in particular from fiber derived from * * * bagasse and the like" without admixture of foreign binders, applied for after the Mason patent had issued.

■ The case, however, turns not on the invention but on the patent, and the question is whether the appellant, assignee of the Mason patent, may under the claims, properly construed, recover against the appellee for infringement. This is the sole question for discussion as under the law and on the facts we are, after a consideration carefully made and too long to recite in an opinion, constrained to resolve against the defendant the question of invalidity in view of the art and because anticipated by prior patents and prior art structures.

■ Referring to the opinion of the trial court ([D. C.] 1 F. Supp. 494) for a more detailed statement of what happened, the central facts bearing on infringement, shortly stated, are these: The defendant had been, and still is, manufacturing on a large scale porous insulating boards made of bagasse fiber. The source of this fiber is stalks of sugar cane after the juice has been extracted. They contain cellulose, lignins and pentosans of the same types though in different proportions found in trees. Like wood at saw mills, bagasse is a waste product of cane sugar mills.

The vice-president and the engineer of the defendant visited the plaintiff's plant and requested permission to inspect it. As the defendant's insulating board, not being a hard board, did not in any way compete with the plaintiff's hard board, the request was granted. Mason conducted them through the plant, then operating on saw mill waste, and showed them "the whole thing," including the machinery especially designed to carry out the process of the patent. The machinery bore the maker's name and address. Later the defendant purchased from the same maker machinery of the same design and embarked upon the manufacture of hard board from bagasse.

The difference between the process of making its insulating board and that of making its hard board is significant. In making its insulating board from bagasse, which contains from 40 to 45 per cent. wood fiber, the defendant, after cooking the bagasse, shreds it mechanically. The product is wood fiber. It then adds a percentage of waste newsprint paper pulp which is a mixture of ground wood pulp and sulphite pulp. Thus the mix is chemical; and being chemical the lignin content is reduced. As the product and process of the patent are essentially and expressly non-chemical and call for the retention of lignins, the defendant's insulating board and process do not approach infringement. In making its alleged infringing hard board, however, the defendant, as before, shreds the bagasse into fiber but in cooking omits the chemical newsprint paper pulp and thereby avoids destroying the lignins. It then adds about ten per cent. of lime. This,

on first view, looks like a chemical mix. By the chemical action of lime, the acidity of the mix, an objectionable quality occasioned by the fermentation of residual sugar, is overcome and the mix neutralized, but lime in this quantity does not appreciably reduce the lignin content. In consequence, that essential of the patented product is substantially retained. Hence the mix ceases to be chemical in the sense of the patent, and substantially the whole fiber is heated and physically pressed into a hard board by a machine which is a duplicate of the machine of the plaintiff. We make this finding against the defendant's contention that its bagasse fibers are bonded together not by lignins but by hydrated cellulose produced by beating and that its product (though advertised as having a tensile strength of 4000 pounds to the square inch, being in some respects analogous to steel plate and having a high water resistance) is nothing more than thick paper, made by known paper-making procedure.

We hold that if bagasse is a fiber base within the scope of the claims, the defendant's hard board, made, as it is, substantially by the process of the patent, comprising, as it does, "practically all the substance of the original wood or woody material" and possessing substantially all the characteristics of the hard board of the patent, infringes.

Thus we come to the claims of the patent of which product claim 5 and process claim 16, quoted in the opinion of the trial court, are typical. (D. C.) 1 F. Supp. 494, 497. Following an opening sentence of the specification that "Ligno-cellulose materials, such as wood, and the like are adapted for use in making my improved products," these claims disclose a product and the method of making it "of wood or woody material * * * comprising practically all the substance of the original wood or woody material." The learned trial court, being influenced by the history of the invention and the patent prosecution, by construction deleted the words "or woody material" from the claims and limited the invention to "wood," defining the word as meaning wood of a tree.

As to the history of the invention, the learned trial court said that "the Mississippi forests and the waste of the saw mills inspired and circumscribed Mason's inventive thought." They doubtless inspired his thought but we are not persuaded that they circumscribed it, for Mason in developing his invention experimented in making hard boards not only from tree wood but from straw, corn stalks and other things. His in-

vention is, of course, only circumscribed by his patent disclosures in view of the art.

The learned trial court in thus limiting the patent to fiber of tree wood very properly considered the prosecution of the application for a patent, yet we fear it was improperly influenced by it. The Patent Office cited as a reference against Mason's application letters patent No. 528,612, issued November 6, 1894 to Shaw for a burial casket or coffin made of straw pulp. The disclosures as to pulp content are vague; they are silent as to the use of fiber containing lignins. The major portion of the patent is directed to a method of shaping the coffin structure and drying it. It refers only to "pulp made in the usual manner in suitable pulp mills." It appears that pulp from straw, usually, is chemically digested pulp treated with an alkali such as lime. Whether a lime treatment of straw pulp under the Shaw patent will remove or retain the lignins of straw, or whether straw pulp of that patent can be made into the hard board of this patent, we cannot find from the record. However, Mason, whose application did not deal with chemical fiber bases, filed a disclaimer in which he said that such chemically treated straw fiber is not adapted for use in his process and product. The learned trial court found this to be "a full disclaimer by Mason of the use of straw." If this were an infringement contest between the Mason and Shaw patents, involving infringement by the use of straw, we would, of course, have to construe Mason's disclaimer. But, for convenience, taking the disclaimer as the trial court construed it, as disavowing the use of straw, it is plain that all it disclaimed was straw. It disclaimed nothing else. Bagasse is something else. Clearly it is not straw. In this case we are concerned with bagasse, not with straw, as an infringing ingredient.

Other aspects of the patent prosecution which the learned trial court thought significant were amendments made by Mason at the suggestion of the Examiner (to avoid claiming the invention in terms of lignins) by striking out the words "ligno-cellulose product" and "ligno-cellulose material" as they appeared in the claims of the application and substituting the common words "wood or woody material" in the claims allowed. As the claims, so amended and limited, extend to wood and woody material, the mere fact of amendments from what may be more comprehensive terms to ones less comprehensive cannot further limit the meaning of the words finally employed and allowed. So the pat-

entee is still entitled to the fiber sources of "wood" and "woody material" whatever those words may mean.

From the disclaimer of straw and the amendments as to "wood or woody material" the defendant evolved the idea, reflected in the court's opinion, that Mason disclaimed and amended himself out of everything which, like straw, is of annual growth, and thereby limited his patent to fiber of perennial growth, "the natural product of the tree." We find no such breadth in the disclaimer and no such limitation in the amendments. At most the thing disclaimed was straw, not everything of annual growth, for, conceivably, many things—certainly bagasse—though grown within a year consist of woody material capable of yielding the fiber required by the patent. Neither can we find a limitation to fiber of trees either in the specification or in the claims as amended. The specification deals with "Ligno-cellulose materials, such as wood, and the like" as a fiber source. That, seemingly, is all-comprehensive. The claims cover "wood or woody material" as a fiber source. The difference between the words of the specification and the words of the claims may involve a difference in thought, and, though difficult to grasp, may work a limitation in the claims. The expression "Ligno-cellulose materials, such as wood," we think, means natural wood, tree wood. The expression "and the like" obviously means something else, yet something "like" wood with its ligno-cellulose quality. And so the word "wood" in the claims means one thing, "natural wood," which in turn means tree wood. Then the term "or woody material" must mean something other than tree wood, yet something which like tree wood has fiber in quantity and quality that will produce the product of the patent by its process. These critical expressions deal with fiber of fixed requirements to be obtained, however, from two sources, wood material and woody material. There is no showing in the record that use of fiber from one source involves any essentially different principle or mode of operation than use of fiber from the other source. It follows that, although the resultant product is the same, the word "wood" and the term "woody material" cannot mean the same fiber source, and that, being in the claims, the two cannot have the same meaning. Each has a meaning of its own; and to each, properly defined, the patentee is entitled. We think, and therefore hold, the claims mean and cover any wood or woody material which yields wood fiber in kind and quantity that will produce an article with the characteristics disclosed by the patent when made in the way the patent teaches.

We find, on the evidence and on its own demonstration, that bagasse is such a woody material.

Claims 22 and 26 are limited to "wood."

Holding the claims in suit valid, and claims 5, 6, 14, 16, 20 and 23 infringed, the decree of the District Court, except as it dismissed the bill in respect to claims 22 and 26, is reversed with direction that the bill be re-instated as to the six claims first named and further proceedings had in conformity with this opinion. Costs of appeal are assessed against the appellee.

THOMPSON, Circuit Judge, dissenting.